**UNION TRUST COMPANY OF ELLSWORTH**

v.

**Walter T. HARDY.**

Supreme Judicial Court of Maine.

April 20, 1979.

Foster Law Offices by Stephen D. Foster (orally), Philip R. Foster, Ellsworth, for plaintiff.

Pine Tree Legal Assistance, Inc. by John Whitehouse Cobb (orally), Bangor, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

WERNICK, Justice.

Defendant Walter T. Hardy, the debtor in a secured transaction with the plaintiff Union Trust Company of Ellsworth, has appealed from a judgment entered in the Superior Court (Hancock County) awarding plaintiff a recovery of the deficiency it claimed due on the debt and deciding against defendant debtor on his counterclaim seeking certain penalties under Maine's "Truth-in-Lending Act" (Article VII of 9–A M.R.S.A.).

We sustain defendant's appeal as to the judgment's adjudication in favor of plaintiff on the complaint and, reversing the judgment in this part, we order entry of judgment for the defendant on the complaint. We hold that the Superior Court committed error of law in deciding that particular circumstances present here overcame the bar established by *Camden National Bank v. St. Clair*, Me., 309 A.2d 329 (1973) against a creditor's recovery of the deficiency due on the debt where the creditor has failed to send the debtor the "reasonable notification" required by 11 M.R.S.A. § 9–504(3).[1]

---

1. Defendant's responsive pleading to the complaint, beyond asserting that plaintiff creditor violated the statutory provision that it send the debtor reasonable notification of its intended disposition of the collateral and therefore could not recover the claimed deficiency, makes allegations denominated "affirmative defenses" regarding defendant debtor's right to statutory penalties for particular violations by the creditor in disposing of the collateral. As to all of these penalties, with the exception of that alleged for the creditor's failure to dispose of the collateral in a "commercially reasonable" manner, defendant pleaded plainly and expressly

Although we find also erroneous the ground assigned by the Superior Court for deciding against defendant debtor on his counterclaim for "truth-in-lending" penalties, to-wit, that the creditor's disclosures were adequate to satisfy the statutory requirements, we nevertheless uphold the decision for another reason. The counterclaim asserted defendant's right to penalties long after expiration of the one-year period prescribed by the Truth-in-Lending Act for the commencement of a court action to recover penalties, and, therefore, despite the benefit given defendant by the "counterclaim" exception stated in 14 M.R. S.A. § 865 (Supp.1978), the denial of a recovery to plaintiff on its complaint precludes any recovery by defendant on the instant counterclaim. Accordingly, we deny defendant's appeal from that part of the Superior Court's judgment adjudicating against defendant on his counterclaim.

### 1. The Facts.

On November 20, 1975 defendant Hardy arranged to borrow $2,604.21 from the plaintiff bank. The loan was a consumer loan not under an open-end credit plan. Defendant executed a promissory note in the amount of $3,014.70, which included the $2,604.21 advanced to the debtor plus a credit life insurance charge of $21.04 and a finance charge of $389.45. The debtor put up his automobile, a 1974 AMC Hornet, as collateral to secure the note. The terms of the transaction were embodied in an integrated document comprising the note, a written security agreement and disclosures. This document, titled "Security Agreement —(Chattel Mortgage) Including Disclosure Statement", contained additional provisions that the loan was also secured by "any and all additions and accessions" to the collateral and that the security agreement "will cover after-acquired property."

Having defaulted in making payments under the note, and after receipt of several written demands for payment, the debtor Hardy wrote the creditor:

"I guess I'll give up my car. I am sorry but I can't handle the payments. Would you please come and get the car as soon as possible."

On April 12, 1976 defendant turned over possession of the automobile to an agent of the creditor. At the same time, the agent obtained defendant's signature to a writing, already drafted by the creditor, which stated:

"I, Walter T. Hardy, being unable to meet the payments on my loan No. 68–1071–9, do hereby release my automobile to the Union Trust Co. of Ellsworth. I understand that I am still responsible for any monies due the said Union Trust Co.

that he should be awarded them as an "offset" against a recovery by the plaintiff. Our decision denying plaintiff recovery on its complaint makes unnecessary our consideration of these penalties sought only as "offsets."

More troublesome is defendant's position as to the statutory penalty sought for the alleged violation of "commercial reasonableness" in the creditor's disposition of the collateral. While defendant pleads this, under the label "affirmative defense", as a bar to plaintiff's recovery of the deficiency, again using the "affirmative defense" designation, defendant avers that plaintiff "is liable to the defendant for the statutory penalties set forth at 11 M.R.S.A. § 9–507." In the same responsive pleading defendant includes a plainly identified "Counterclaim" for the statutory penalties prescribed *for creditor violations* of the Truth-in-Lending Act; yet, he fails to make such a Counterclaim for the Commercial Code penalty as to creditor's commercial reasonableness violation. Although we may have the authority to go behind defendant's "affirmative defense" label to treat defendant's assertion of a liability of plaintiff to defendant as a "counterclaim", see Rule 8(a), (c) and (f) M.R.Civ.P., we think it inappropriate to do that in this case. The argumentation presented in defendant's brief and reply brief, as well as the "Conclusion" in each said brief which asks only that this Court "order the dismissal of plaintiff's complaint . . . and the entry of judgment for the defendant on his Counterclaim", satisfies us that, despite the variation in the language used to plead as to the "commercial reasonableness" penalty, defendant in substance was taking the same position on it as on the other penalties he claimed for alleged Commercial Code violations, namely, that the "commercial reasonableness" penalty was to be considered only as an "offset" against a recovery by the plaintiff.

Thus, our decision denying plaintiff any recovery makes it unnecessary that we address the merits of any of defendant's Commercial Code penalty claims.

on my loan over and above that which is received for the sale of my automobile."

Stipulations, as well as testimony, make plain that it was always plaintiff bank's assumption, here, that because it had acquired possession of the collateral by the debtor's "voluntary surrender" of it, instead of through a repossession effectuated against the debtor's wishes, the bank was relieved of the statutory obligation to send the debtor notification of its intended disposition of the collateral. Accordingly, without giving any such notification, plaintiff made several attempts (consuming almost a year) to sell the automobile and at last sold it to realize $1,400.00. Applying this amount against the sum of (1) the balance due under the note (2) costs of collection and (3) the interest that had accrued, plaintiff bank brought suit for a claimed deficiency of $1,204.21. In his answer defendant debtor resisted the claim, asserting that plaintiff's failure to afford him notification of the intended sale of the collateral, as mandated by 11 M.R.S.A. § 9–504(3) (1964), required that plaintiff be denied recovery of the deficiency. Defendant also counterclaimed for certain statutory penalties designated by Maine's Truth-in-Lending Act, 9–A M.R.S.A. § 7.122, as sanctions for the failure of a lender to make adequate disclosures to the debtor.

After a hearing, the Justice presiding in the Superior Court ordered entry of a judgment awarding plaintiff bank the deficiency it claimed and denying defendant recovery for the penalties sought in his counterclaim. Findings of fact and conclusions of law subsequently made by the Justice disclose the following reasons for his decision: (1) as to the § 9–504(3) requirement of the Commercial Code for the sending of "reasonable notification" to the debtor of the creditor's intended disposition of the collateral, (a) either it had been rendered inapplicable in the instant circumstances, or (b) if it remained applicable, the evidence established that the creditor had complied with it or, in any event, that the debtor had waived his right to notification; and (2) as to defendant debtor's counterclaim for "truth-in-lending" penalties, the disclosures made by

the creditor were adequate to comply with the statutory mandates.

### 2. The § 9–504(3) Requirement for "Reasonable Notification."

Part 5 of the Commercial Code's Article Nine sets out a carefully articulated system of rights and obligations for both debtor and secured party. A primary enforcement mechanism afforded the debtor,

"[i]f it is established that the secured party is not proceeding in accordance with the provisions of this part",

is

"a right to recover from the secured party any loss caused [thereby] . . . ." 11 M.R.S.A. § 9–507(1) (1964)

Where, as here, the collateral is consumer goods, § 9–507(1) makes special provision for a recovery "in any event", even if there is no actual loss, according to a fixed formula.

■ Central to the scheme of mutual rights and duties established by Part 5 is the requirement that

"reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . . ." 11 M.R.S.A. § 9–504(3) (1964)

It is settled in this jurisdiction that the creditor's compliance with this statutory requirement of notification is a condition precedent to the creditor's recovery of a deficiency. *Camden National Bank v. St. Clair, supra.*

In the case at bar the presiding Justice allowed plaintiff to recover the deficiency because, as indicated above, he found in essence that various grounds existed making *Camden National Bank* inapplicable.

■ One such ground was that the debtor's spontaneous written response to the creditor's demand letters, in which he invited the creditor to "come and get the car", constituted a "voluntary surrender" which, in the view of the presiding Justice, made it

unnecessary for the creditor to comply with the notification requirement.

We find this approach erroneous. Article Nine nowhere alludes to the concept of "voluntary surrender." Judicial engrafting of the conception into Article Nine, more particularly to make it the basis for rendering inapplicable the § 9–504(3)·requirement of reasonable notification, would be likely to induce defaulting debtors to avoid a cooperative delivery of possession of the collateral to the creditor, lest by so cooperating the debtor be held to have made a "voluntary surrender" which forfeits his right to a notification that is so central to the safeguarding of additional debtor rights to redeem or to have an appropriate disposition of the collateral. Debtor resistance to the secured party's exercise of its right to take possession of the collateral upon default or debtor disregard of legitimate contractual provisions requiring that the debtor "assemble the collateral and make it available to the secured party . . .", see 11 M.R.S.A. §§ 9–503, 9–504(3) and Comment 5 thereto, 9–506, and 9–507(1) and Comment 1 thereto, would severely undercut the interrelated policies infusing Article Nine: to promote peaceful repossessions and to safeguard the rights of debtors to redeem, as well as to participate in public sales or otherwise to insist upon "commercial reasonableness" in the course of other dispositions of collateral. We therefore reject the presiding Justice's view that the debtor's "voluntary surrender" of his automobile to the creditor relieved it of the obligation to comply with the notification requirement of § 9–504(3).

The presiding Justice's alternative rationale for allowing plaintiff bank to recover the deficiency was that the document executed by the debtor on April 12, to repeat the language of the Justice, "put the . . [debtor] on notice that a sale would be held and amounts to a waiver of his right to notice." This phrasing appears to make two separate points: (1) the document was itself the creditor's notification to the debtor and thus established the creditor's compliance with the statutory requirement for notification; (2) in any event, the document

established a waiver by the debtor of his statutory right to notification. We disagree with the presiding Justice on each point.

■ The April 12th document cannot be taken as the creditor's discharge of its statutory obligation to provide notification. If the document indicated, by implication, that the debtor had been made aware that the collateral would be sold, the creditor's giving the debtor this barely generalized information cannot satisfy the creditor's statutory obligation to provide reasonable notification of such *particulars* as

> "the *time and place* of any public sale or . . . the *time after which* any private sale or other intended disposition is to be made . . .." 11 M.R.S.A. § 9–504(3) (1964) (emphasis added) and Comment 5 thereto.

In reinforcement of this conclusion, the concepts of reasonableness and good faith that underlie "*every* aspect" of the secured party's statutory duties in disposing of collateral plainly demand more by way of the creditor's "sending" reasonably effective notification to the debtor than the April 12th document which the creditor had arranged for the debtor to sign, here, at the same time the creditor was acquiring possession of the collateral. See 11 M.R.S.A. §§ 1–203, 9–504(3) and Comment thereto. (emphasis added)

We turn to the presiding Justice's other view that the April 12th document established the debtor's post-default waiver of his statutorily prescribed right to notification.

Effective January 1, 1978, the Legislature amended § 9–504(3) to provide in express terms that, subject to one exception, a debtor can make a legally effective *post-default* waiver of his right to notification. The exception is that where the transaction involves consumer goods as the collateral, no such post-default waiver can be legally effective.

As enacted after the date of the transaction at issue, this amendment cannot govern the present case. Yet, it may have

highly significant bearing concerning whether the controlling 1964 law which unquestionably prohibited a pre-default waiver by a debtor of his § 9–504(3) right to notification also prohibited such a waiver *after default.*

It is surely arguable that this was the meaning of the textual language of § 9–501(3) expressly, and broadly, declaring that "the rules stated in the subsections referred to below *may not be waived* or varied . . . ." (emphasis added) One said subsection was subsection 3 of § 9–504 which prior to the amendment effective January 1, 1978 contained no authorization for a post-default waiver in any respect of the notification requirement therein prescribed.[2]

On this line of argument, the 1978 amendment to § 9–504(3) could be taken to fulfill dual purposes: (1) to *retain* for transactions involving consumer goods as the collateral the prior law's more extensive prohibition against a debtor's post-default waiver of his § 9–504(3) right to notification and (2) to *remove* the prior law's prohibition against such a waiver in transactions where the collateral is *other* than consumer goods.

■ Challenging as the question is whether the pre-1978 law prohibited the debtor's post-default waiver here found by the presiding Justice, we conclude that we need not make a decision on the question in this case but need only advert to its existence as support for the decision we do reach: that even if we assume that the instant debtor could have made a legally effective post-default waiver of his § 9–504(3) right to notification, as a matter of law the evidence here is insufficient to establish such a waiver. That it is open to serious question whether prior to January 1, 1978 the post-default waiver here at issue could have been recognized as legally effective highlights the point that, particularly

as to consumer goods collateral, the pre-1978 law was at least not favorably inclined toward such post-default waivers and demanded that they be strictly scrutinized. This much is surely the message of Comment 4 to § 501 which is at pains to note that, traditionally, the courts have exhibited a "suspicious attitude" as to the "default situation" because it "offers great scope for overreaching" in the direction of "cut[ting] down the debtor's rights and free[ing] the secured party of his duties . . . ."

Using such strict scrutiny approach, we conclude that the presiding Justice was wrong in construing the April 12th document as the debtor's waiver of his right to notification. We stress that the document was prepared by the creditor and that the debtor signed it at the time he was willingly and peacefully turning over possession of the collateral to the creditor. In these circumstances the language that the debtor "release[s] my automobile to the Union Trust Co. of Ellsworth" cannot be interpreted to mean that the debtor was releasing "*all interest* in the vehicle" (emphasis added), as the presiding Justice construed it, but must be held, rather, to be the debtor's acknowledgement in writing of what was actually happening: the debtor was willingly and peacefully delivering the possession of the collateral to the creditor.

Because the April 12th document was prepared by the creditor it also becomes most significant that the creditor cannot be taken to have been seeking the debtor's signature to it to have it serve as the debtor's waiver of his statutory right to notification. By stipulations, and the testimony of agents of the plaintiff, the record shows beyond dispute that it proceeded entirely on the assumption (we have held erroneous) that since the debtor voluntarily delivered possession of the collateral, in contrast to the creditor's repossessing the collateral against the debtor's wishes, plaintiff was not under obligation to send the notification

2. The decisions in other jurisdictions all recognize that § 9–501(3) prohibits pre-default waivers, but there is a division of authority as to whether the prohibition applies also to post-default waivers. For example, contrast *Hall v.*

*Owen County State Bank,* 370 N.E.2d 918 (Ind. App.1977) with *Nelson v. Monarch Investment Plan of Henderson, Inc.,* 452 S.W.2d 375 (Ky. 1970).

required by § 9–504(3). With plaintiff proceeding on this approach, it did not need a waiver from the debtor, and that is why it did not place in the April 12th document any reference to the debtor's right to notification or any express statement that the debtor was fully aware of such right and knowingly and deliberately renounced and relinquished it. *A fortiori,* then, the document cannot be interpreted to attribute to the debtor such a knowing and deliberate renunciation of his right to notification, cf. *Interstate Industrial Uniform Rental Service, Inc. v. Couri Pontiac, Inc.,* Me., 355 A.2d 913, 919 (1976), especially because of the importance of this right in enabling the debtor to resort to the other rights conferred upon him after default.

■ It is thus plain that the notification requirement of § 9–504(3) continued operative here, and plaintiff having failed to comply with it, *Camden National Bank v. St. Clair, supra,* governs to preclude plaintiff's recovery of the deficiency remaining due on the debt. The Superior Court's judgment must be reversed in that part of it adjudicating in favor of plaintiff on its complaint, entry of a judgment on the complaint in favor of defendant being required.

### 3. The Truth-in-Lending Act Disclosure Violation.

■ The integrated "Security Agreement —(Chattel Mortgage) Including Disclosure Statement", bearing date of November 20, 1975, is stipulated to have contained all the disclosures made by the creditor at the time of the loan, as relevant for the purposes of Maine's Truth-in-Lending Act, 9–A M.R.S.A. §§ 7.101 et seq. (Supp.1978).[3] The gravamen of the debtor's counterclaim for penalties under that Act, is that

> "said disclosures failed to provide a clear description or identification of the type of any security interest, with a clear identification of the property to which such interest relates, in particular as that security interest purports to cover after-acquired property . . .",

in essence a failure to disclose, as required by statute and regulation, the scope of the security interest claimed in "after-acquired property."[4]

The presiding Justice ruled that the description complied with the statute and regulation because of the limiting references to the vehicle and any additions or accessions.

This ruling, however, does not fairly meet the substance of the debtor's claim. The

---

**3.** Other stipulations were to the effect that the parties were a "creditor" and a "debtor" who had engaged in a transaction meeting the requirements of a "consumer loan not under an open-end credit plan", as those terms are defined in the Maine Truth-in-Lending Act.

**4.** 9–A M.R.S.A. § 7.114(1) provides:
  "Each creditor shall disclose clearly and conspicuously, in accordance with the regulations of the administrator, to each person to whom consumer credit is extended and upon whom a finance charge is or may be imposed, the information required under this Article."
  With regard to consumer loans not under open-end credit plans, 9–A M.R.S.A. § 7.121(1)(H) provides:
  "Any creditor making a consumer loan or otherwise extending consumer credit in a transaction which is neither a consumer credit sale nor under an open-end consumer credit plan shall disclose each of the following items, to the extent applicable:

  .    .    .    .    .

  "A description of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit,

and a clear identification of the property to which the security interest relates."
Reg. No. 6, Dept. of Banks and Banking, eff. July 1, 1969, § 8(2)(E) provides:
  "In any transaction subject to this section, the following items, as applicable, shall be disclosed:

  .    .    .    .    .

  "A description or identification of the type of any security interest held or to be retained or acquired by the creditor in connection with the extension of credit, and a clear identification of the property to which the security interest relates or, if such property is not identifiable, an explanation of the manner in which the creditor retains or may acquire a security interest in such property which the creditor is unable to identify. . . . If after-acquired property will be subject to the security interest, or if other or future indebtedness is or may be secured by any such property, this fact shall be clearly set forth in conjunction with the description or identification of the type of security interest held, retained or acquired."

debtor's point was that the description of the security interest fails to disclose the restriction set forth in 11 M.R.S.A. §§ 9–204(3) & (4)(b) whereby under an after-acquired property clause a security interest may not attach to "consumer goods other than accessions" in which the debtor acquires rights more than ten days after the creditor gives value. See 11 M.R.S.A. § 9–204, Comment 7 (1964). In stating that it "will secure future or other indebtedness and will cover after-acquired property", the Agreement nowhere mentions the 10-day period as relevant to consumer goods and the constrictions it imposes regarding a security interest. Thus, a debtor reading this seemingly *unlimited* after-acquired property clause could not know from it that, except for accessions, consumer goods in which the debtor acquired rights more than ten days after value is given by the creditor are free of the security interest.

Such misdescription contravenes the statutory directive that the creditor disclose in every consumer loan "a clear identification of the property to which the security interest relates." 9–A M.R.S.A. § 7.121(1)(H) (Supp.1978). The overwhelming majority of cases construing the federal scheme as well as the statutes of other states which, like our Act and like our implementing Regulation No. 6, Dept. of Banks and Banking, eff. July 1, 1969, § 8(2)(E), are drawn directly from the federal models[5] have held that this particular form of misleading and inaccurate disclosure of the creditor's purported rights against the debtor is forbidden.[6] The lender is required to explain the 10-day limitation in his disclosure statement because

> "without such information the . . . [debtor] could not be expected to make a meaningful credit decision weighing the costs of alternative credit sources, the avowed purpose of the Truth in Lending Act." *Jones v. Allied Loans Inc.,* 447 F.Supp. 1121, 1127 (D.S.C.1977).[7]

We conclude, then, that the presiding Justice erred in holding that the creditor's disclosures complied with the requirements of 9–A M.R.S.A. § 7.121(1)(H) (Supp.1978).

■ For another reason, however, we must sustain the ultimate decision denying defendant debtor a recovery on his counterclaim. The Truth-in-Lending Act fixes a one-year period within which an action for the recovery of a penalty must be brought. 9–A M.R.S.A. § 7.122(5) (Supp.1978). Since this time limitation is attached as an incident of the legislative creation of the special cause of action for penalty, compliance with it is a substantive facet of the cause of action. Hence, if it appears that the action asserting the cause of action for penalty was brought after expiration of the one year period prescribed for the commencement of it, the cause of action cannot be held to have been established, and the action for penalty fails, even if, as here, the lateness in the bringing of the action was neither pleaded nor otherwise brought to the attention of the trial court. *Bellegarde Custom Kitchens, Inc. v. Leavitt,* Me., 295 A.2d 909 (1972).[8] The record, here reveals

---

**5.** *Compare* 15 U.S.C. § 1638(a)(10) *and* 12 C.F.R. § 226.8(b)(5) *with* 9–A M.R.S.A. § 7.121(1)(H) *and* Reg. No. 6, Dept. of Banks and Banking, eff. July 1, 1969, § 8(2)(E). *See* 9–A M.R.S.A. § 7.124 (Supp.1978), entitled "Conformity with federal law."

**6.** E. g., *Pollock v. General Finance Corp.,* 535 F.2d 295 (5th Cir. 1976), *aff'd on rehearing,* 552 F.2d 1142 (5th Cir. 1977), *cert. denied,* 434 U.S. 891, 98 S.Ct. 265, 54 L.Ed.2d 176 (1977); Annot., 32 A.L.R.Fed. 863 (1977 & Supp.1978) (citing cases at § 4(b)).

We have found no state case contrary to the federal trend. See, e. g., *Garza v. Allied Finance Co.,* 566 S.W.2d 57 (Tex.Civ.App.1978); *Aronson Furniture Co. v. Johnson,* 47 Ill.

App.3d 648, 7 Ill.Dec. 776, 365 N.E.2d 61 (1977).

**7.** 9–A M.R.S.A. § 7.102 (Supp.1978) provides, in pertinent part:

> "It is the purpose of this Article to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

**8.** Defendant points to our decision in *Norton v. Penobscot Frozen Food Lockers, Inc.,* Me., 295 A.2d 32 (1972) to induce us to apply its approach, allowing procedural default, or waiver, to operate to allow a recovery notwithstanding that the action was unseasonably brought. We find the reference to *Norton* unpersuasive.

affirmatively that plaintiff creditor's violation of the Truth-in-Lending Act occurred on November 20, 1975, when the creditor made its disclosures in the integrated document entitled "Security Agreement—(Chattel Mortgage) Including Disclosure Statement." Defendant debtor's counterclaim asserting his cause of action for penalty was brought August 8, 1977, long after the one-year limitation period.

Moreover, that the debtor sought the penalties in a counterclaim, instead of by instituting an independent action, avails him nothing in this case. The saving exception in 14 M.R.S.A. § 865, as inserted by an amendment in 1969 (Supp.1978), regarding a

> "counterclaim arising out of the transaction or occurrence that is the subject matter of the plaintiff's claim . . .",

authorizes at most that defendant may resort to the cause of action, extinguished because time-barred, which is asserted by the counterclaim only in defensive reduction of the amount of defendant's liability to plaintiff. See Field, McKusick & Wroth, *Maine Civil Practice,* § 13.8a at 279, 280. Since we have concluded that defendant has no liability to plaintiff, defendant can take nothing by his counterclaim. The Superior Court judgment adjudicating against defendant on his counterclaim is therefore correct and must be upheld.

The entry is:

Appeal sustained in part and denied in part.

The judgment of the Superior Court is affirmed insofar as it adjudicates for plaintiff against defendant on defendant's counterclaim.

The judgment of the Superior Court is reversed insofar as it adjudicates in favor of the plaintiff on plaintiff's complaint; ordered that judgment be entered in favor of the defendant on the complaint, with costs.

That case rests on a line of judicial interpretations, dating back to 1922, which assign a special nature to the proceedings in workers' compensation cases, as reflected by the special pro-

Case remanded to the Superior Court for entry of judgment in accordance with the aforesaid.

Costs on appeal to defendant.

POMEROY and DELAHANTY, JJ., did not sit.

visions for procedure that had been contained in the Workers' Compensation statutes from their earliest days. See *Morin's Case,* 122 Me. 338, 341, 342, 120 A. 44 (1923).