[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
The plaintiff, A-1 Auto Service, Inc., d/b/a A-1 Toyota ("A-1" or "the plaintiff"), is an automobile dealer, engaged in the retail sale of motor vehicles, new and used. The defendant, plaintiff on the Counterclaim, Jane Horkavy, ("Horkavy" or "the defendant") visited the plaintiff's premises on or about July 5, 1996, with an interest of trading in her 1995 BMW and purchasing another motor vehicle. A dispute arose between the parties, leading to this action.
The plaintiff's "Revised Complaint," dated January 3, 1997, is in four counts. The First Count alleges breach of contract, claiming that the defendant breached a contract to purchase a certain 1995 Toyota Celica pursuant to a retail purchase order agreement dated July 5, 1996. The Second Count alleges tortious interference with contract, claiming the defendant tortiously interfered with A-1's contract with a third party, Arcadia Financial Services ("Arcadia"), to provide financing for a deal between the plaintiff and defendant. The Third Count alleges misrepresentation by the plaintiff in indicating she intended to purchase the said Celica. The Fourth Count alleges unjust enrichment, alleging CT Page 6949 that the defendant's actions to the detriment of A-1, resulted in Horkavy's enrichment at the expense of the plaintiff.
The Defendant, in her "Answer, Revised Special Defenses and Counterclaim," dated May 5, 1997, denies wrongdoing and raises five special defenses. The First Special Defense alleges that A-1 failed to mitigate its damages. The Second Special Defense alleges that A-1 knew its payment to BMW Financial Services was not then authorized or approved by Horkavy; accordingly, recovery from Horkavy is barred. The Revised Third Special Defense alleges unfair or deceptive sales practices by A-1. The Fourth Special Defense alleges violation by A-1 of the Retail Instalment Sales Financing Act, particularly General Statutes, §36a-785 and the Uniform Commercial Code, particularly General Statutes, § 42a-9-504. The Fifth Special Defense asserts that communications between the defendant and Arcadia were privileged, and were, moreover, an effort by the defendant to mitigate damages.
The defendant's Counterclaim is in two counts. The Revised First Count alleges breach of contract by A-1, and violations by A-1 of the Retail Instalment Sales Financing Act or the Uniform Commercial Code or failure by A-1 to proceed in a commercially reasonable manner. The Second Count alleges that Horkavy bought a Celica from A-1 on or about July 5, 1996; that Horkavy cancelled the purchase transaction on or about July 6, 1996; that A-1 subsequently refused to return her down payment and refused to return the BMW or the trade-in value thereof.
In its "Reply to Special Defenses and Answer to Counterclaim" the plaintiff denied each and every material allegation of the five special defenses and denied the Counterclaim's allegations of wrongdoing by A-1.
A hearing on the Revised Complaint and Counterclaim opened on November 6, 2000, continued on November 7, 8, 9, 14, 17 and to November 21, 2000, when, the parties having rested, the matter was continued for briefing.
 II
It is undisputed that Horkavy, accompanied by her mother, came to A-1's premises on July 5, 1996 to shop for a car. Horkavy at that time was the owner of a BMW. She found the monthly payments on said BMW burdensome and hoped to trade the BMW in and purchase a Toyota on terms that would require lower monthly payments than she was then obligated to pay on the BMW. On July 5th, Horkavy signed a purchase order to purchase a certain 1995 Toyota Celica from A-1. The total cash price for the Celica was $24,135.00 and the deal included the trade-in of the BMW. During the negotiations of July 5th, an employee of A-1, Frank Mikolike indicated he was interested in purchasing the BMW and would pay $20,000.00. A-1 CT Page 6950 gave the BMW a trade value of $20,000. Horkavy owed approximately $25,100 on the BMW; resulting in a "trade deficiency" of approximately $5,100. The "cash price" of the Celica was derived by adding the deficiency to the Celica's sale price. Horkavy also signed a retail instalment contract in furtherance of the purchase of said Celica. The total sale price for the Celica, including financing, was $31,861.64. On July 5th Horkavy made a down payment to A-1 of $2,400.00 on the Celica in the form of a check for that amount tendered by her mother. Also on July 5th, Horkavy left the BMW and its keys at A-1 and departed the premises driving the Celica. The Celica was electronically registered in Horkavy's name with the Department of Motor Vehicles ("the DMV") at approximately 4:00 p.m. on July 5, 1996. A-1 paid BMW Financial Services the sum of $25,125.19 by check dated July 9, 1996, which represented the amount owed by Horkavy on the BMW as of July 5, 1996. Horkavy decided she did not want the Celica and on July 6, 1996, telephoned A-1. On July 10, 1996, Horkavy met with Anna Lynn Wheeler of A-1 in an unsuccessful effort to resolve Horkavy's unhappiness with her transaction with A-1. On July 24, 1996, Horkavy returned the Celica to A-1's premises. Horkavy made no further payments toward the purchase price of the Celica. Through the efforts of counsel for both parties the DMV eventually allowed the July 5th registration of the Celica to be withdrawn on the grounds that Horkavy had "rejected delivery," thus allowing A-1 to sell said vehicle as "new." On September 9, 1996, A-1 sold the Celica to Anthony Sacco for a total cash price of $22,010.54. On October 22, 1996, A-1 sold the BMW to Devele McCord for a total cash price of $25,686.54. A-1 retained Horkavy's down payment on the Celica.
As a result of the collapse of the transaction between the parties, the plaintiff emerged with the BMW, for which it had expended $25,125.19; the Celica; and Horkavy's down payment of $2,400.00. A-1 claims Horkavy is liable for several thousand dollars in losses it incurred as the result of Horkavy's actions. Horkavy emerged without the BMW, without the Celica and without the $2,400.00 down payment[1] but free of the $25,125.19 debt owed on the BMW.
 III
In its First Count, the plaintiff claims the defendant Horkavy breached a contract to purchase the Celica at issue. The contract referred to is the retail purchase order agreement dated July 5, 1996. (Plaintiff's Exhibit #9). A-1 insists the First Count is based on this agreement only and that it is making no contract claims under the retail instalment contract signed by the parties, also on July 5, 1996 (Plaintiff's Exhibit #10).
Recapitulating the chain of events, on July 5, 1996, the parties CT Page 6951 entered into the agreements cited; Horkavy left the BMW with A-1, gave A-1 a down payment of $2,400.00 and departed in the Celica. On that same day, the Celica was registered electronically with the Department of Motor Vehicles in Horkavy's name. This registration, as we shall see, became a critical impediment to the parties' efforts to modify their agreement. In addition, the parties signed a DMV "Assignment and Authorization for Payoff" form, transferring title to the BMW from Horkavy to A-1 (plaintiff's #20), and A-1, by check dated July 9, 1996, paid off the full amount owing on the BMW to BMW Financial Services. Meanwhile, on July 5th, Horkavy, having driven off in the Celica, was unhappy with the deal and the car. She called A-1 the next day and by July 10, 1996, arrived at A-1 to meet with A-1 personnel, notably Anna Lynn Wheeler, to discuss the situation. Apparently, there was some discussion concerning substituting another vehicle, a Camry, for the Celica, but the discussion stalled when Wheeler learned that because the Celica had been registered, it could not be sold by A-1 as "new" were A-1 to take it back from Horkavy and the selling price would thus be diminished significantly. Neither side was willing to absorb the loss and the meeting ended without positive results. On July 11, 1996 Horkavy's lawyer contacted Arcadia in an effort to persuade Arcadia not to purchase the retail instalment contract. Arcadia subsequently did decline to purchase said contract. On July 24, 1996 Horkavy returned the Celica to A-1's premises and in a letter to A-1 dated July 24th (Joint Exhibit #7) declared, "the transaction dated July 5, 1996, is void and of no effect."
As indicated, A-1 claims that it suffered losses as the result of Horkavy's breach of the retail purchase order agreement between the parties. The terms of said agreement include:
 7. If I do not accept delivery of the vehicle within 5 days (after I have been notified that it is ready for delivery): I will forfeit any deposit previously made on this order (whether by cash or trade-in vehicle); you may retain such deposit which will then (at your option) constitute liquidated damages for my breach of this contract."
Horkavy claims the retail purchase order is not "legally cognizable," in that said purchase order was a "preliminary document" replaced by the "final document," the retail instalment contract. According to this reasoning, the parties were not bound by the terms of the retail purchase order, including paragraph 7, once the retail instalment contract was signed. The Court finds that both agreements were valid and binding on the parties, the one having to do with the purchase and sale of the Celica and the other, that is, the retail instalment contract, with the CT Page 6952 financing of said purchase and sale.
The question then becomes: Did Horkavy refuse to accept delivery of the Celica within 5 days? or did Horkavy's return of the Celica to A-1 on July 24th constitute a repossession of the Celica, albeit through voluntary surrender of the vehicle by Horkavy? It is clear from the record that both parties, as well as the DMV treated Horkavy's return of the Celica as a rejection of delivery of the vehicle (Joint Exhibit #22), at least for purposes of withdrawing Horkavy's application for title certificate, thus restoring the Celica's status as "new." There is no reason to believe that the DMV was in any way deceived by this assertion; rather there was testimony that such was the result of efforts by counsel for the DMV and attorneys for the parties. In the peculiar circumstances of this case, the Court concludes that Horkavy's action in returning the Celica is deemed a refusal to accept delivery and not a default in the payment of any sum due under the retail instalment contract.
Horkavy claims she entered the retail purchase agreement under duress. She claims that A-1 refused to return her key to the BMW when she asked for said keys. She has failed to establish these claims by a fair preponderance of the evidence. The Court finds that the defendant Horkavy did indeed breach the terms of her agreement with A-1, specifically paragraph 7. The Court finds that the plaintiff, A-1, elected to retain the deposit of $2,400.00 and to retain by purchase the BMW, pursuant to paragraph 7. A party may provide for the retention of a deposit as liquidated damages for the purchaser's failure to perform, Greene v.Scott, 3 Conn. App. 34, 39. The Court finds that such retentions constituted liquidated damages for Horkavy's breach of the agreement between the parties. It is well settled that a seller may not retain a stipulated sum as liquidated damages and also recover actual damages,Hanson Development Co. v. East Great Plains Shopping Center, Inc.,195 Conn. 60, 64. The plaintiff, having exercised its option to retain the defendant's deposit as liquidated damages, is estopped from claiming and recovering additional damages under the contract. Accordingly, the court dismisses the plaintiff's First Count.
In the course of her defense against the complaint Horkavy claimed other misconduct by the plaintiff, A-1, such as to warrant dismissal of A-1's claims. Such alleged misconduct includes violations of General Statutes, § 14-12 (d); 15 U.S.C. § 1682 (in) (Fair Credit Reporting Act); § 1691(d), Equal Credit Opportunity Act); General Statutes, § 3-94a; General Statutes, § 14-62 (b), Reg. Conn. State Agencies § 42-110b-28; 28 U.S.C. § 1232 (f) ("The Monroney Act"). Given the court's dismissal of the plaintiff's Complaint, extended discussion of these allegations is not required. Said allegations were CT Page 6953 not established by the requisite standard of proof.
Assuming, arguendo, that A-1 is entitled to claim unliquidated damages, A-1 would fare no better. A-1's claims, totaling approximately $5,400.00, were not established. Said claims included: cost of money tied up by A-1's purchase of the BMW, calculated by A-1 as $25,125.19 times an interest rate of 9.75% divided by 365, multiplied by 113 days, for a total of $758.40. At the time of hearing, the author of said formula acknowledged she was uncertain as to the accuracy of the 113 number; and had applied a "floor plan" interest rate of 9.75% rather than an actual interest rate This claim is not established. Likewise, A-1's claim of damages in the amount of $1,400.00 for salesman's commission on A-1's sale of the BMW fails. A-1's witness acknowledged that a flat commission in such amount was "very unusual", a typical commission being in the $150.00 range. A-1 failed to establish the necessity of such an extraordinary expenditure. A-1 makes a claim for damages totaling $726.00 for extraordinary advertising expense. This is calculated by determining that the BMW was advertised in several of A-1's periodic "ads" in the New Haven Register and the Bargain News and attributing 1/25th of the cost of said ads to the BMW on the ground that 1/25th of the ad space was devoted to the BMW. The Court would reject this claim as not reflective of actual expenses. There was no suggestion that A-1's expenditure on these ads would have been reduced had A-1 chosen not to include the BMW in said ads. Moreover, A-1 in its claim for damages failed to credit Horkavy with the $2,400.00 down payment as an offset. A-1 acknowledged it made a profit on the subsequent sale of the Celica but failed to credit this to Horkavy as an offset. The disallowances cited, added to the offsets cited would yield negative damages for the plaintiffs.
 IV
The plaintiff, in its Second Count, claims tortious interference with contract, in that the defendant contacted Olympic Financial Ltd., d/b/a Arcadia Financial Ltd. ("Arcadia") in an effort to block Arcadia's purchase of the retail installment sales contract between A-1 and Horkavy (Joint #1, #2). In fact, the defendant did contact Arcadia in an effort to persuade Arcadia not to purchase said contract and Arcadia did decline to purchase said contract.
The elements of tortious interference with contract rights are well established. "One who intentionally and improperly interferes with the performance of a contract. between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract,"Selby v. Pelletier, 1 Conn. App. 320, 322, quoting from 4 Restatement CT Page 6954 (Second) Torts § 766. But not every act that disturbs a contract or business expectancy is actionable," Robert S. Weiss Associates, Inc.v. Wiederlight, 208 Conn. 525, 535-36 (citations omitted). For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. The burden is on the plaintiff to prove at least some improper motive or improper means. Solomon v. Aberman, 196 Conn. 359, 365
(quotation marks, citations omitted).
The plaintiff has failed to establish its claim of tortious interference by the defendant. It has failed to establish that the defendant's action caused it actual loss. It has failed to establish that the defendant acted with improper motive. Assuming, arguendo, that Arcadia declined to finance the defendant's Celica purchase as a result of the defendant's efforts, through her attorney, to block Arcadia's purchase of the retail instalment contract at issue, the plaintiff established no loss as the result of such blockage. A-1 paid no monies to Arcadia, retained Horkavy's down payment and retained possession of the Celica.
 V
The plaintiff's Third Count does not warrant extensive discussion. A-1 claims Horkavy misrepresented her intention to purchase the Celica and by her signed authorization of payoff directed A-1 to pay BMW Financial Services, to A-1's detriment. Horkavy's claim that she thought she had three days within which time she could change her mind (about purchasing the Celica) does not suffice to establish misrepresentation by her in signing said retail purchase order. The plaintiff has failed to establish, by a fair preponderance of the evidence, that the defendant entered into the retail purchase order agreement with the intent not to purchase the Celica.
 VI
As to the Fourth Count, A-1 claims Horkavy was unjustly enriched in that A-1 paid off the balance owed by Horkavy on the BMW without the corresponding purchase by Horkavy of the Celica. Unjust enrichment applies whenever justice requires compensation to be given for property or services rendered under a contract and no remedy is available by an action on the contract, Gagne v. Vaccaro, 255 Conn. 390, 401 (quotation marks, citation omitted). The right of recovery for unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for the defendant to retain a CT Page 6955 benefit which has come to him at the expense of another. With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. Id., at 408, 409 (quotation marks, citations omitted). The doctrine of unjust enrichment has three basic requirements: (1) the defendant was benefitted; (2) the defendant unjustly failed to pay the plaintiff for the benefits; and, (3) the failure of payment was to the plaintiff's detriment, Id., at 409 (citations omitted). The measure of damages is not the loss to the plaintiff but the enrichment of the defendant.
Applying these standards to the facts of this case the Court concludes that the plaintiff has failed to establish its claim by a fair preponderance of the evidence. First, there were remedies available to the plaintiff under the contract at issue and the plaintiff elected one such remedy, invoking the liquidated damages provision of said contract. Second, while it can be argued that the defendant derived a benefit, in that she was relieved of the obligation to make payments on the BMW, this benefit was offset by the defendant's loss of ownership and use of said vehicle. Treating the purchase of the Celica and the trade-in of the BMW as a single transaction, the Court cannot find that the defendant derived a benefit as a result of her actions in the matter.
The plaintiff has failed to establish its claims under all four counts. Having exercised its right to liquidated damages, A-1 has no claim under the retail purchase agreement. Accordingly, as to the Complaint, the Court will enter judgment in favor of the defendant.
 VII
The Revised First Count of the defendant's Counterclaim sets out four distinct causes of action: breach of contract; violation of the Retail Installment Sales Financing Act ("RISFA"), General Statutes, § 36a-770
ff.; violation of the Uniform Commercial Code, title 42a; ("the UCC"); and failure to proceed in a commercially reasonable manner. The defendant Horkavy alleges she purchased the Celica from A-1 on July 5, 1996, making a down payment of $2,400.00 and trading in her BMW in connection with the transaction, and that she returned the Celica to A-1 on or about July 24, 1996. Horkavy characterizes the act of returning the vehicle as a "voluntary repossession."
The acts or omissions of A-1 alleged in support of these claims are failures by A-1 to comply with the notice provisions of General Statutes, § 36a-785 and § 42a-9-504. CT Page 6956
Section 36a-785, in pertinent part reads: "When the retail buyer is in default in the payment of any sum due under the retail installment contract or installment loan contract, or in the performance of any other condition which such contract requires him to perform, or in the performance of any promise, the breach of which is by such contract expressly made a ground for the retaking of the goods, the holder of the contract may take possession thereof."
A-1 argues there was no repossession by it, as Horkavy voluntarily returned the Celica to A-1 absent a demand by A-1 that she do so, absent any notice by A-1 that it intended to repossess said vehicle. A-1 also points out that it has never claimed a deficiency on resale of the Celica. Horkavy, who has consistently claimed that the transaction at issue was void ab initio and of no effect by virtue of duress, and who cooperated with A-1 to withdraw the July 5, 1996 registration of the Celica to Horkavy on the ground that she refused to take possession of said Celica, now, to support her claim of RISFA violations by A-1, must characterize the said retail installment contract as a valid contract, binding on A-1, and requiring A-1 to comply with § 36a-785, and its notice provisions. To aid her in invoking the notice provisions of §36a-785, Horkavy characterizes her return to A-1 of the Celica as a "voluntary repossession." It is true that a voluntary surrender of a vehicle by a buyer in default may constitute a repossession by the holder of a retail instalment contract, See, e.g., Union Trust Co. v. Hardy,400 A.2d 384, 388 (ME. 1979). But Horkavy has argued that she never accepted delivery of the said Celica albeit that she had physical possession of said vehicle for some nineteen days. Indeed, the parties, with advice of counsel, agreed that Horkavy "rejected delivery" of the Celica. Horkavy was not in default of any payment at the time she left the Celica at A-1's premises. A-1 has never claimed or sought to recover from Horkavy a deficiency on the Celica. Although consumer legislation must be interpreted so as to implement its remedial purpose of protection for consumer buyers; even such legislation cannot transcend its statutorily defined ambit. Gaynor v. Union Trust Co., 216 Conn. 458, 466
(citations omitted). Where there is no taking there can be no retaking or repossession; the Court finds Horkavy refused to accept delivery of the Celica, hence A-1 was not required to comply with the notice provisions of § 36a-785 or § 42a-9-504. Similarly, the defendant Horkavy, failed to establish that A-1's course of conduct constituted a failure to proceed in a commercially reasonable manner.
In her Second Count, Horkavy claims she purchased the Celica from A-1 on July 5, 1996, pursuant to a retail instalment contract between the parties; that on July 6, 1996 she, Horkavy cancelled the purchase transaction; that A-1 refused to return her down payment of $2,400.00 and CT Page 6957 refused to return the BMW or the trade-in value thereof. Horkavy claims such conduct by A-1 constituted violations of the Connecticut Unfair Trade Practices Act, General Statutes, § 42-110a et seq., ("CUTPA"), as well as of RISFA, the UCC and the Creditors' Collection Practices Act, General Statutes, § 36-645 et seq., ("CCPA") "or common law."
The elements of a CUTPA claim are well established. General Statutes, § 42-110b states: No person shall engage in unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce. Section 42-110g provides that "any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by § 42-110b may bring an action . . . to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.
"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the "cigarette rule' by the federal trade commission for determining when a practice is unfair: (i) [W]hether the practice, without necessarily having been previously been considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise — in other words, it is at least within the penumbra of some common law, statutory, or other concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other business persons] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three (citations omitted; internal quotation marks omitted.) Willow Springs CondominiumAssociation, Inc. v. Seventh BRT Development Corporation, 245 Conn. 1,43. Whether a practice is unfair and thus violates CUTPA is an issue of fact. Id.(citation, quotation marks omitted.)
Applying these principles to the facts of this case, the Court concludes that the defendant Horkavy has failed to establish, by a fair preponderance of the evidence, that A-1, by its actions, violated CUTPA. This dispute was triggered by Horkavy's failure to comply with the provisions of the retail purchase order agreement. She went on to attempt to persuade Arcadia not to purchase the retail instalment contract. Her justification for so acting was that A-1 had used pressure and harassment to force her to sign the retail purchase order and the retail instalment contract and that she departed A-1's premises in the Celica only because she had no choice, A-1 having refused to relinquish the keys to her BMW. Therefore, Horkavy claimed, she was not bound by the terms of the retail CT Page 6958 purchase order. The Court has found that Horkavy has failed to establish these claims of misconduct by A-1.
A-1's characterization of Horkavy's action is inconsistent, A-1 in its complaint alleging that Horkavy took delivery of the Celica, while certifying to the MVD that the sale was never finalized because there was no delivery to the purchaser. Horkavy's characterization of her own action also is inconsistent; at times she has claimed she rejected delivery of the Celica, as when she collaborated with A-1 to withdraw her application for certificate of title, while, when seeking to establish violation of RISFA's notice requirements by A-1, she argues she took delivery of the Celica and that A-1 repossessed the said vehicle There was testimony that in the course of the dispute leading to this law suit she demanded the return of the BMW but apparently she never undertook to assume the financial obligations attending such a return.
The court also found that A-1 did not violate the notice provisions of RISFA on the notice provision of the UCC. In the circumstances, the Court cannot find that A-1's conduct was immoral, unethical, oppressive or unscrupulous. A-1 sought to work with the defendant Horkavy to undo the deal and when that effort failed, A-1 pursued legal remedies. The Court finds no violation by A-1 of CUTPA and no violation of CCPA.
The Court finds that the defendant Horkavy has failed to establish her claims under the First or Second Count of her Counterclaim. Having failed to establish liability of A-1, Horkavy's claim for treble damages for theft pursuant to General Statutes § 52-564 must fail. So, too, does her claim for attorney's fees pursuant to § 42-150bb.
 VIII
Accordingly, on the Complaint, judgment may enter in favor of the defendant, Jane Horkavy as against the plaintiff A-1 Auto Service, Inc.
On the Counterclaims, judgment may enter in favor of A-1 Auto Service, Inc. defendant on the Counterclaims, as against Jane Horkavy, plaintiff on the Counterclaims
By the Court,
John T. Downey Judge Trial Referee