MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2025 ME 93
Docket:         Aro-25-27
Submitted
 On Briefs:     September 24, 2025
Decided:        November 25, 2025

Panel:          STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and LIPEZ, JJ.

THE COUNTY FEDERAL CREDIT UNION

v.

MICHAEL MADORE et al.

LIPEZ, J.

[¶1] Michael Madore appeals from a judgment of the District Court (Fort Kent, *Linthicum, J.*) awarding The County Federal Credit Union possession of a 2022 Ski-Doo Expedition snowmobile. Madore asserts that the court erred in issuing judgment for the credit union on its complaint for recovery of personal property because the credit union did not hold a valid security interest in the snowmobile and because Madore was a bona fide purchaser for value without notice of the credit union's interest. We reject these contentions and affirm the judgment.

## I. BACKGROUND

[¶2] We draw the following facts from the court's findings, which are supported by competent record evidence. *See Mitchell v. Mitchell*, 2022 ME 52,

¶ 8, 284 A.3d 89.

[¶3]  On January 24, 2022, Edward Richard entered into a loan agreement with the credit union, pursuant to which the credit union lent Richard $15,076.64 to purchase a 2022 Ski-Doo Expedition snowmobile.  To secure the loan, the credit union took a security interest in the snowmobile.  On the same day, the credit union filed with the Maine Secretary of State a UCC[1] Financing Statement reporting its security interest.

[¶4]  On February 6, 2023, Richard sold the snowmobile to Madore's son, Michael Madore Jr., for $15,500.[2]  Richard did not notify the credit union of the sale.  Richard told Madore's son that there were no liens on the snowmobile and showed the son the documents that he had received from the dealer at the time of purchase.  The Madores did not check for UCC filings recording liens on the snowmobile or otherwise investigate the possibility that a third party held an interest in the snowmobile.

---

[1]  "UCC" is short for "Uniform Commercial Code," the model code of statutes governing commercial transactions, which is codified in Maine at 11 M.R.S. §§ 1-1101 to 15-306 (2025).  *See* U.C.C. Gen. Cmt. of Nat'l Conf. of Comm'r's of Unif. State L. and the A.L.I. (A.L.I. & Unif. L. Comm'n), Westlaw (database updated June 2023); *Gen. Motors Acceptance Corp. v. Colwell Diesel Serv. & Garage, Inc.*, 302 A.2d 595, 597 (Me. 1973).

[2]  Although the court did not distinguish between Michael Madore (the appellant) and Michael Madore Jr. (the appellant's son) in its findings of fact, Madore presented uncontradicted evidence that Michael Madore Jr. purchased the snowmobile as a gift for his father.  Madore does not argue that the credit union improperly named him as a defendant in its complaint for recovery of personal property.

[¶5]  Richard later defaulted on the loan, prompting the credit union to issue him a notice of right to cure on March 1, 2024.  Richard did not cure the default.  The credit union then discovered that Madore had acquired the snowmobile.

[¶6]  On May 6, 2024, the credit union filed a complaint for recovery of personal property pursuant to 14 M.R.S. § 7071 (2025), naming both Richard and Madore as defendants.  Richard filed for bankruptcy on June 19, 2024, and received a discharge[3] on September 18, 2024.

[¶7]  On December 18, 2024, the court held a hearing on the credit union's complaint.  Richard did not attend.  On January 15, 2025, the court entered judgment for the credit union, ordering Madore to turn over the snowmobile to the credit union.

[¶8]  Madore moved for further findings of fact and conclusions of law,[4] and on January 22, 2025, the court issued an order making additional findings.  *See* M.R. Civ. P. 52(b).  This timely appeal by Madore followed.  *See* M.R. App. P. 2B(c)(2)(B).

---

[3]  The general effect of a discharge in bankruptcy is to release the debtor from personal liability for certain existing debts.  *See* 11 U.S.C.A. § 524 (Westlaw through Pub. L. No. 119-36).

[4]  Although Madore cited M.R. Civ. P. 52(a) in his motion, the substance of the motion indicates that Madore intended to request amended or additional findings of facts pursuant to M.R. Civ. P. 52(b). *See* M.R. Civ. P. 52(a)-(b).

4

## II. DISCUSSION

## A.    Security Agreement

[¶9]  Madore first contends that the court erred in finding that the credit union had a valid security interest in the snowmobile because the loan documents that Richard signed did not comply with the requirements of 11 M.R.S. § 9-1203 (2025), which governs the attachment and enforceability of security interests.

[¶10]  We review matters of statutory interpretation de novo.  *Corinth Pellets, LLC v. Arch Specialty Ins. Co.*, 2021 ME 10, ¶ 19, 246 A.3d 586.  We review findings of fact for clear error and will vacate the court's findings only when there is no competent evidence in the record to support them.  *Mitchell*, 2022 ME 52, ¶ 8, 284 A.3d 89.

[¶11]  Maine has adopted the Uniform Commercial Code in Title 11 of the Maine Revised Statutes.  *Gen. Motors Acceptance Corp. v. Colwell Diesel Serv. & Garage, Inc.*, 302 A.2d 595, 597 (Me. 1973); *see* 11 M.R.S. §§ 1-1101 to 15-306 (2025).  Article 9-A governs secured transactions.  *See* 11 M.R.S. § 9-1101.  The general rule is that a security interest "attaches to collateral when it becomes enforceable against the debtor with respect to the collateral," *id.* § 9-1203(1),

and that a security interest becomes enforceable against a debtor when, as relevant here,

> **(a)** Value has been given;
> **(b)** The debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
> **(c)** . . . (i) The debtor has authenticated a security agreement that provides a description of the collateral . . . .

*Id.* § 9-1203(2)(a)-(c).[5]  A "security agreement" is "an agreement that creates or provides for a security interest."  *Id.* § 9-1102(73).

[¶12]  The parties in this case do not dispute that value was given or that the debtor (Richard) had rights in the collateral (the snowmobile).  They disagree, however, as to whether Richard "authenticated a security agreement that provides a description of the collateral," as required by section 9-1203(2)(c)(i).

[¶13]  At issue are the documents comprising the agreement that Richard executed to obtain the loan from the credit union.  The agreement, entitled "Loan and Security Agreements and Disclosure Statement," consists of five pages, with the first identified as a "Truth In Lending Disclosure" statement, the

---

[5]  The quoted language, which has now been superseded, was in effect at all times relevant to this case.  On July 1, 2025, revised text became effective.  *See* P.L. 2023 ch. 669 §§ A-89, E-1 (effective July 1, 2025) (codified at 11 M.R.S. § 9-1203(2)(c) (2025)).  Both the revised text and the now superseded text are printed in the 2025 edition of West's Maine Revised Statutes, along with a note explaining when the revised text would take effect.  *See* 11 M.R.S. § 9-1203(2)(c).

6

second and third as a "Loan Agreement," and the fourth and fifth as a "Security Agreement."

[¶14]    The truth-in-lending disclosure statement, in addition to identifying the loan amount, the interest rate, and the payment schedule, provides:

> Security: . . . .  You are giving a security interest in . . . the property described below[.]

The 2022 Ski-Doo Expedition snowmobile is identified as "[c]ollateral" directly beneath this language.  The first page of the agreement further states:

> By signing as Borrower, you agree to the terms of the Loan Agreement.  *If property is described in the 'Security' section of the Truth in Lending Disclosure, you also agree to the terms of the Security Agreement.*  If you sign as 'Owner of Property' you agree only to the terms of the Security Agreement.

(emphasis added).  Richard's electronic signature, dated January 24, 2022, appears in a signature box on this page of the Agreement labeled "Borrower." Richard did not sign in a box provided on page five, labeled "Owner of Property," at the end of the section titled "Security Agreement."

[¶15]  Madore points to the absence of Richard's signature on page five—part of the so-called "Security Agreement"—as evidence that the credit union lacks the authenticated security agreement it needed to properly attach its security interest under section 9-1203(2)(c).  We conclude, however, that

Richard's signature on the first page of the agreement satisfied the statute's authentication requirements. *See id.* § 9-1203(2)(c)(i).

[¶16] The plain language of sections 9-1102(73) and 9-1203(2)(c)(i), when read together, provides that a security interest is not enforceable unless (1) the debtor authenticates an agreement (2) that creates or provides for a security interest and (3) provides a description of the collateral. Here, the agreement supports the court's finding that these elements were met: (1) it is signed by Richard, (2) it expressly states, "You are giving a security interest in . . . the property described below," and (3) in the space provided for a description of property, it lists the make, model, year, and identification number of the snowmobile.

[¶17] Madore's argument—that no enforceable agreement exists because Richard failed to sign the pages labeled "Security Agreement"— elevates form over substance and lacks statutory support. Nothing in section 9-1203(2)(c)(i) requires a debtor to sign a separate formal document labeled as a "security agreement" so long as the signed writing at issue clearly identifies the secured property. *See Frace v. Canal Nat'l Bank (In re Frace)*, 17 B.R. 198, 200-01 (Bankr. D. Me. 1982) (explaining that "[i]t is settled that a separate formal document entitled 'security agreement' is not necessary to satisfy the

signed-writing requirement. . . . The requirements . . . are met if the evidence identifies the property secured beyond dispute, and if that evidence is in the form of signed writings sufficient to satisfy the Statute of Frauds" (citations omitted)); 68A Am. Jur. 2d *Secured Transactions* § 147 (2003) ("The Uniform Commercial Code reduces the formalities of a secured transaction and of the security agreement to a minimum.  No special words are necessary to create a security interest. . . . [Nor does the UCC] require a formal document labeled 'security agreement.'  To the contrary, a writing (or interconnected writings), regardless of label, if it adequately describes the collateral, carries the signature (authentication) of the debtor, and establishes that a security interest was agreed upon, satisfies both the formal requirements of the statute and the policies behind it.").

[¶18]  Furthermore, while Madore emphasizes the technicality and specificity required by some provisions of the UCC, the purpose of the security agreement is primarily evidentiary; it shows that the debtor has agreed to the creation of the security interest.  *See* U.C.C. § 9-203 cmt. 3 (A.L.I. & Unif. L. Comm'n), Westlaw (database updated June 2023) (referring to the authenticated security agreement as an "evidentiary requirement in the nature of a Statute of Frauds"); 79 C.J.S. *Secured Transactions* § 30, Westlaw (database

updated May 2025) ("The function of a security agreement is merely to evidence the intention of and define the rights of the contracting parties. The agreement serves a Statute of Frauds function as between the creditor and debtor."); *see also Casco Bank & Tr. Co. v. Cloutier*, 398 A.2d 1224, 1231 (Me. 1979) (identifying the "'frauds' and evidentiary policies" served by security agreements). There is therefore "a judicial tendency to overlook defects and irregularities [in security agreements] when it is unlikely that any prejudice will be caused by them. Any writing that satisfies the minimal requirements for a security agreement, and intended to be a security agreement, is generally held to be a security agreement." 68A Am. Jur. 2d *Secured Transactions* § 167 (2003). This is consistent with one of the stated purposes of the UCC, which, contrary to Madore's assertion, is to "make the law of commercial transactions, as far as reasonable, liberal and nontechnical." *Id.*; *see also Gen. Motors Acceptance Corp.*, 302 A.2d at 599 (noting that the "underlying purposes and policies" of the UCC include "to simplify, clarify and modernize the law governing commercial transactions"). Our holding here is in keeping with this goal.

[¶19] Indeed, we have long adhered to this approach, noting in *Cloutier* that it is "well settled" that "there is no requirement that the description of the

10

collateral be complete within the four corners of the security agreement or other single document." 398 A.2d at 1229 (quotation marks omitted). In that case we instead held that two documents—a promissory note that referenced a security interest but did not describe the collateral and a separate financing statement that did describe the collateral—together formed a "composite" that sufficed to satisfy the signed-writing requirement of Article 9. *Id.* at 1231-32.[6] It stands to reason that if two separate documents may be read together to create an enforceable security agreement, then a single document that addresses each of the statutory prerequisites is also sufficient, even if not formally designated as a "security agreement." Page one of the agreement, which Richard signed, satisfies this standard.[7]

[¶20] Finally, although we hold that section 9-1203(c)(2)(i) does not require a document formally designated as a "security agreement," we note that here, the truth-in-lending disclosure statement that Richard signed as

---

[6] In *Cloutier* we analyzed 11 M.R.S. § 9-203 (1964), which was later repealed and replaced by 11 M.R.S. § 9-1203. *Casco Bank & Tr. Co. v. Cloutier*, 398 A.2d 1224, 1226, 1228-32 (Me. 1979); *see* P.L. 1999, ch. 699, §§ A-1, A-2 (codified as subsequently amended at 11 M.R.S. § 9-1203 (2025)). The relevant language of the statutes is substantially the same. *Compare* 11 M.R.S. § 9-203 (1964), *with* 11 M.R.S. § 9-1203 (2025).

[7] Contrary to Madore's contention, this case is not like *Maine League Fed. Credit Union v. Atlantic Motors*, where we concluded that a UCC financing statement lacking the signature of the secured party failed to comply with the statutory requirement that such statements be "'signed by the debtor and the secured party,'" 250 A.2d 497, 500 (Me. 1969) (quoting 11 M.R.S.A. § 9-402(5)(1969)). Here, Richard plainly signed the agreement.

"Borrower" makes clear that if property is designated as collateral on that statement (as it was here), then a debtor who signs as a "Borrower" "agree[s] to the terms of the Security Agreement." Thus, by the agreement's own terms, Richard did agree to the "Security Agreement."[8] *See* 11 M.R.S. § 9-1203(2)(c)(i).

## B.    Bona Fide Purchaser for Value Without Notice

[¶21]   Next, Madore asserts that the trial court judgment should be vacated because his son was a bona fide purchaser for value of the snowmobile without notice of the credit union's interest and therefore Madore owns the snowmobile free of the credit union's lien. The applicable bona-fide-purchaser defense to an action to recover personal property subject to a security interest is set forth at 11 M.R.S. § 9-1320(2), which provides that

> a buyer of goods from a person who used or bought the goods for use primarily for personal, family, or household purposes takes free of a security interest, even if perfected, if the buyer buys:
> **(a)** Without knowledge of the security interest;
> **(b)** For value;
> **(c)** Primarily for the buyer's personal, family or household purposes; and
> **(d)** Before the filing of a financing statement covering the goods.

---

[8]   We do not reach the question of whether the credit union complied with applicable truth-in-lending disclosure requirements because Madore's argument on this issue is underdeveloped and therefore waived. *See, e.g., Melhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290. And in any case, the remedy for violations of these requirements is a civil penalty, not invalidation of the security agreement. *See Union Tr. Co. of Ellsworth v. Hardy*, 400 A.2d 384, 390-92 (Me. 1979); 9-A M.R.S. § 8-505(5) (2025); 15 U.S.C.A. § 1640 (Westlaw through Pub. L. No. 119-36).

12

[¶22]  In its January 15 order, the court found that Madore's son satisfied elements (a) through (c) of this defense but failed on element (d) because the credit union filed its UCC Financing Statement on January 24, 2022, more than a year before the son purchased the snowmobile on February 6, 2023.  Because the record supports the court's findings, we affirm the court's conclusion that Madore does not benefit from the protection of section 9-1320(2).

The entry is:

Judgment affirmed.

Theodore M. Smith, Esq., Smith Law Office, LLC, Van Buren, for appellant Michael Madore

Richard L. Currier, Esq., and Jacob T. Flewelling, Esq., Currier, Trask & Dunleavy P.A., Presque Isle, for appellee The County Federal Credit Union

Fort Kent District Court docket number SA-2024-25
FOR CLERK REFERENCE ONLY